[L.A. No. 29970. In Bank. Mar. 2, 1972.]

WILLIAM F. WENKE, Petitioner, v.
DAVID G. HITCHCOCK, as Registrar of Voters, etc., Respondent.

## COUNSEL

William F. Wenke, in pro. per., Wenke, Kemble & Burge, Gary L. Taylor and John R. Schilling for Petitioner.

Adrian Kuyper, County Counsel, and Victor T. Bellerue, Deputy County Counsel, for Respondent.

Edmund G. Brown, Jr., as Amicus Curiae.

## OPINION

**SULLIVAN, J.**—Petitioner seeks a writ of mandate directing respondent David G. Hitchcock, as registrar of voters, to issue to petitioner, and to accept from petitioner for filing, nomination papers for the office of Supervisor of the First Supervisorial District of Orange County. For reasons set forth *infra*, we have concluded that petitioner is qualified to be a candidate for such office and that, therefore, the writ should issue.

We set forth the undisputed facts. Petitioner is, and at all material times has been an adult citizen and resident of Orange County. For approximately 18 years prior to November 15, 1971, he was a resident and elector of the First Supervisorial District; during the last seven years of that period his residence was located at 1015 Rivieria Drive, City of Santa Ana, within the boundaries of the district.

During October 1971, and for several months prior thereto, the Board of Supervisors of Orange County (Board) studied various plans for adjusting the boundaries of the supervisorial districts in that county so as to make

them equal in population. (See Gov. Code, §§ 25001, 25001.1.)[1] At that time, an election was planned for 1972 for the office of Supervisor of the First Supervisorial District because of the expiration of the incumbent's regular term of office. None was planned however for the office of Supervisor of the Fourth Supervisorial District. On October 27, 1971, the Board adopted a redistricting ordinance which, among other things, removed 3,000 persons from the First District and placed them in the Fourth District.

At the time the redistricting ordinance was adopted, it was generally known in the community that petitioner, whose residence was within the area to be removed from the First District to the Fourth District, intended to be a candidate from the First District. However, since the elections in the various districts are staggered, there will be no election for supervisor in the Fourth District until 1974.

On November 5, 1971, the County Counsel of Orange County issued an opinion clarifying the rights of potential candidates under the redistricting ordinance. In pertinent part, the opinion stated: First, that the ordinance would become effective 30 days from the date of final passage, i.e., on November 26, 1971; and second, that a candidate for supervisor must have been a resident of the supervisorial district in which he runs for at least one year preceding the primary election, whether he is elected at the primary or general election.[2] The opinion continued: "If a potential candidate has resided within a given numbered district and his place of residence after November 26, 1971 would no longer be within that numbered district, he may, before that date, change his place of residence to another location

---

[1]Government Code section 25001 provides: "Following each decennial federal census, and using the census as a basis, the board shall adjust the boundaries of any or all of the supervisorial districts of the county so that the districts shall be as nearly equal in population as may be. In establishing the boundaries of the districts the board may give consideration to the following factors: (a) topography, (b) geography, (c) cohesiveness, continuity, integrity, and compactness of territory, and (d) community of interests of the districts."

Government Code section 25001.1 provides: "The boundaries of the supervisorial districts shall be adjusted by the board before the first day of November of the year following the year in which each decennial federal census is taken. If the board fails to adjust the boundaries before the first day of November following the year in which the federal census is taken, a supervisorial redistricting commission shall do so before the 31st day of December of the same year. The adjustment of the district boundaries shall be immediately effective the same as if the act of the supervisorial redistricting commission were an ordinance of the board, subject, however, to the same provisions of referendum as apply to ordinances of the board."

[2]"Each member of the board of supervisors shall be elected by the district which he represents, and not at large . . . ." (Gov. Code, § 25040.) "[E]ach member shall have been an elector of the district which he represents for at least one year immediately preceding his election, and reside in the district during his incumbency." (Gov. Code, § 25041.)

which has been and will be within the numbered district, as the boundaries will be after November 26, 1971, and preserve the continuity of the necessary year's residence within that district."

On November 15, 1971, apparently relying on this opinion, petitioner moved his residence and family three blocks to 2106 North Baker Street, City of Santa Ana, a location which had been within, and, under the redistricting ordinance, continued to remain within, the First District. On February 11, 1972, however, the county counsel issued a new opinion reversing its prior position as to a candidate's right to remain within a given district by changing his residence before the effective date of the new ordinance. This reversal of position was based on the case of *Lindsey* v. *Dominguez* (1933) 217 Cal. 533 [20 P.2d 327]. The new opinion of the county counsel interpreted *Lindsey* as holding in respect to Los Angeles councilmanic elections that a candidate could not move and preserve his continuity of residence in the district. Concluding that *Lindsey* cast considerable doubt on his first opinion but still believing that the case was not totally persuasive, the county counsel understandably modified his first opinion to conform to *Lindsey* by stating: "[T]hat a candidate must have been an elector for one year prior to June 6, 1972, *in the territory which now comprises* the district in which the election is being conducted." (Original italics.)

On February 14, 1972, petitioner attempted to file with respondent his completed Candidates Information Statement together with the required filing fee and requested his nomination papers. Respondent, however, acting in accordance with the county counsel's second opinion, refused to issue them. Petitioner alleges that his last day for filing nomination papers is March 10, 1972. Invoking our original jurisdiction, he seeks a writ of mandate directing the registrar of voters to issue nomination papers and accept them for filing.

This court has "original jurisdiction in proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition." (Cal. Const., art. VI, § 10; see Cal. Rules of Court, rule 56a.) As we said recently in *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, fn. 1 [96 Cal.Rptr. 697, 488 P.2d 1]: "We exercise such jurisdiction only in cases in which 'the issues presented are of great public importance and must be resolved promptly.' [Citation.] Cases affecting the right to vote and the method of conducting elections are obviously of great public importance. Moreover, the necessity of adjudicating the controversy before the election renders it moot usually warrants our bypassing normal procedures of trial and appeal. Thus we have exercised our original jurisdiction where electors sought to qualify an initiative for the ballot [citations], where a proposed local

election would have violated the city charter [citation], and where an individual sought certification by the city clerk as a candidate for office. [Citation.]"

■ Resolution of the present controversy is urgent. Petitioner's nomination papers which the registrar has refused to provide must be filed by March 10, 1972, less than a month after these proceedings were initiated. Because of the long-standing opinion in the *Lindsey* case which appears to be unfavorable to petitioner, lower courts are unlikely to grant relief. If the issues are to be resolved on time, we must exercise such jurisdiction.

We are also satisfied that mandamus is a proper remedy. (See Code Civ. Proc., §§ 1085-1086.) ■ "Voting registrars are public officers with the ministerial duty of permitting qualified voters to register. ■ Mandamus is clearly the proper remedy for compelling an officer to conduct an election according to law. [Citations.] ■ Mandamus is also appropriate for challenging the constitutionality or validity of statutes or official acts. [Citations.]" (*Jolicoeur* v. *Mihaly, supra,* 5 Cal.3d 565, 570, fn. 2.)

We turn to the merits. Petitioner contends: (1) that respondent's refusal to issue nomination papers was improper under existing law because *Lindsey* v. *Dominguez, supra,* 217 Cal. 533, is factually distinguishable; (2) that even if *Lindsey* is applicable, it should be overruled; and (3) that respondent's refusal violates petitioner's rights under the First and Fourteenth Amendments to the United States Constitution since petitioner's exclusion as a candidate is not made necessary by a compelling governmental interest.

We must begin with the statutory requirement, which the parties concede is applicable, that to qualify for election as a member of the board of supervisors a candidate "shall have been an elector *of the district* which he represents for at least one year immediately preceding his election, . . ." (Gov. Code, § 25041, italics added; see fn. 2, *ante.*) The parties also concede that in the present controversy the crucial words are those italicized above.

Petitioner relies heavily on an opinion of the Attorney General (31 Ops. Cal. Atty. Gen. 88 (1958)) which according to petitioner passed upon the identical question now confronting us.[3] ■ Although not of controlling

---

[3] The question presented to the Attorney General was as follows: "What effect does a change in supervisor district boundaries have on the eligibility of a person residing in the area changed from one district to another to . . . be a candidate for election to supervisor of the original district?" (31 Ops. Cal. Atty. Gen. 88, 89 (1958).)

His opinion stated in pertinent part: "A candidate for election to supervisor of a district must be an elector of that district for one year immediately prior to his filing

authority, the opinions of the Attorney General have been accorded great respect by the courts. (*Smith* v. *Anderson* (1967) 67 Cal.2d. 635, 641 [63 Cal.Rptr. 391, 433 P.2d 183]; *Carter* v. *Com. on. Qualifications, etc.* (1939) 14 Cal.2d 179, 185 [93 P.2d 140].) Nevertheless, we do not find the above opinion persuasive on the issue before us since it does not mention the *Lindsey* case and did not consider the question there presented in the context of the case at bench.[4] We feel that petitioner's reliance on the above opinion is over-optimistic, if not fully misplaced.

We proceed to petitioner's argument that *Lindsey* v. *Dominguez, supra,* 217 Cal. 533, is inapplicable and therefore presents no obstacle to petitioner's relief. At issue in *Lindsey* was a provision of the Charter of the City of Los Angeles which stated that to be eligible to nomination or election as a member of the city council, a person, among other requirements, " 'must have been a resident of the district from which he is nominated or elected for at least two years next preceding his nomination or election.' " (*Id.* at pp. 534-535.) One Arnold, a candidate on the ballot for councilman, had resided within the boundaries of councilmanic District Ten for seven years. In December 1932, he moved his residence to another location within the same district. In January 1933, the boundaries of District Ten were altered so as to exclude his former residence and make it part of a different district. In March 1933, Arnold filed a petition with the city clerk and took all other steps necessary to have his name placed on the ballot for the forthcoming councilmanic election in District Ten. An elector petitioned for mandate to compel the clerk to omit Arnold's name from the ballot arguing that Arnold could not "tie to his present residence about one and one-half years of his first residence, . . . ." (*Id.* at p. 535.)

With three justices dissenting, this court granted the writ on the theory that districts are "territorial" rather than "political." The court reasoned that if Arnold had remained at his former residence, he could have qualified as a candidate in his new district although he had not resided there for the

nomination papers. To be an elector of a district, a person, among other requirements, must be a resident thereof. If a candidate resides in an area which is excluded from the district in which he plans to file nomination papers, to retain status as an elector in that district it would be necessary for the candidate to move his residence before the effective date of the district boundary change." (*Id.* at p. 89.)

"Thus, to be an elector of a supervisor district, a person must reside in an election precinct thereof. To maintain a residence in a supervisor district, a candidate living in an area that is to be separated from the district in which he desires to be a candidate would have to move out of the area so separated and into an area remaining in the district prior to the effective date of the boundary change." (*Id.* at p. 92.)

[4]Respondent points out to us that the Attorney General did apply the principle of the *Lindsey* case in two later opinions. (34 Ops. Cal. Atty. Gen. 300, 301 (1959); 40 Ops. Cal. Atty. Gen. 259, 260 (1962).)

required period of time. "If he could have used such period of residence for such purpose, had he remained until cut off, it seems logically to follow that he cannot use this same period of time to qualify him as a candidate in the district to which he voluntarily betook himself. [Par.] . . . In other words, Arnold must have resided in the territory comprising the new district for the period required by law." (*Lindsey* v. *Dominguez, supra,* 217 Cal. at p. 536.)

Petitioner here contends that *Lindsey* is factually distinguishable on two bases. First, he points out that *Lindsey* dealt with the requirement that a candidate be a *resident* for a specified period of time, whereas the instant case deals with the requirement that a candidate be an *elector* for a specified period. He argues that being a resident involves territoriality, but that being an elector involves status. At least for our present purposes, the difference indicated by petitioner is meaningless since both requirements are designed to insure some period of continuous physical presence within the district. Whether presence is measured by the period of residency or the period of being an elector, the rule of *Lindsey* would appear to us to be applicable.

Additionally, petitioner states that in *Lindsey* the candidate could have remained at his former residence and run for election in his new district. By comparison, petitioner here points out, that, had he remained at his former residence, he would not have been able to run for election in 1972, since the next election in the Fourth District is to be in 1974. However, application of the rule adopted in *Lindsey* to this situation would not contravene the *Lindsey* court's analysis that election districts are "territorial." It must be remembered that after the prospective candidate in *Lindsey* changed his residence to a place within his old numbered district, he could not run in what would have been his new district so the court's ruling effectively prevented him from running in either district in that year's election. The fact that petitioner here will suffer a greater hardship because he did not have the option of remaining in his former residence and running in what would have been his new district may reflect on the wisdom of the rule announced in *Lindsey,* but it does not provide an adequate basis for distinguishing that case. (See *Gage* v. *Allison* (1971) 22 Cal.App.3d 85, 87, fn. 2 [99 Cal.Rptr. 95].)

This brings us to petitioner's alternate contention that even if *Lindsey* is applicable, that case should be overruled. Since *Lindsey* concerned only a matter of statutory interpretation, principles of stare decisis would normally make us reluctant to disturb its holding. However, because the tests for determining the constitutionality of statutes and ordinances when challenged upon equal protection grounds have undergone such extensive changes in recent years, and because application of the *Lindsey* rationale to questions like the one now before us would raise grave constitutional

problems (as indeed petitioner does raise by his third contention), we must reexamine the pertinent holding in *Lindsey* to see if it has any validity today.

Three justices signed the brief dissenting opinion in *Lindsey*. After noting the majority's acknowledgement that there was an entire absence of authority on the issue before the court, the dissent argued that "the controlling consideration should therefore be the purpose of the charter provision. If familiarity with the problems of the district and with the voters thereof is the test, then the candidate here can certainly qualify, for he was for the full period a resident of a territory of which the present District No. 10 was a part. In other words, every voter in District No. 10 as it was formerly constituted, resided in the same territorial unit he did. [Par.] If the purpose of the statute will not be thwarted by upholding the eligibility of this candidate, then we should, as a matter of policy, do so, and leave to the voters the fullest possible measure of freedom in their choice of officers." (*Id.* at p. 537.) We are impressed with the rationale.

As we recently warned in *Zeilenga v. Nelson* (1971) 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578], "*Lindsey* was decided long before the 'compelling interest' test was applied to the franchise in *Carrington v. Rash* (1965) 380 U.S. 89 . . . and in an era of less sophisticated communications and transportation media. We express no opinion on its validity today. . . ."[5] (*Id.* at p. 723, fn. 3.) Our opinion in *Zeilenga* also echoed the premise of the *Lindsey* dissent by stating that the purpose of residence restrictions on the right to run for public office is to insure "a reasonable knowledge by a proposed candidate of the general requirements of his [constituency]." (*Id.* at p. 723.) Accepting this statement of purpose as correct, agreeing with the analysis presented in the *Lindsey* dissent, and recognizing the improvements in communications since *Lindsey* there is no good reason for precluding petitioner from running for supervisor in the First District. On the contrary, we think that the purpose of the residency requirement would be promoted by permitting a candidate who, prior to his removal therefrom by a redistricting enactment, has resided in a given district for the necessary period of time to run for office in his former dis-

---

[5] *Lindsey* has been cited in only two reported decisions—*Zeilenga* and *Gage v. Allison, supra,* 22 Cal.App.3d 85. In *Zeilenga,* we struck down a residence requirement because it was not necessary to promote a compelling governmental interest and therefore violated equal protection of the laws. *Gage* did not involve the issue presented by the case at bench but upheld a residency requirement where a candidate upon redistricting was placed in a *new* district but attempted to run for office in his *former* district. It is important to note that we are not dealing here with a prospective candidate who has *retained* his former residence, which is now in a *new* district, but who wishes to run in his *old* district.

trict providing he relocates his residence within its boundaries. Every voter in the district as it was constituted before the redistricting resided within the same boundaries as he did. He will undoubtedly be familiar with their problems and needs—certainly as much as the candidate who by fortuity remains in the district unaffected by the change in boundaries. We think it makes good sense to permit him to relocate there and to run for office and that indeed it may thwart the democratic process to insist that he may only run in his new district which may contain relatively few of his former fellow First District residents.

■ We hold, therefore, that a person desiring to become a candidate for the office of member of the board of supervisors who has been an elector within a given supervisorial district but will be made a nonresident thereof by redistricting may choose one of two alternatives. He may choose to apply his previous period of residence to his new supervisorial district or to his former supervisorial district to the end of becoming a candidate for such office either in his new district or in his former district. In the event he chooses to be a candidate for the office of supervisor of his former district from which his place of residence will be excluded by such redistricting, in order to preserve his period of residency, he must, prior to the effective date of the boundary change, relocate his residence in his former district by moving it to a location therein which has not been removed therefrom by the redistricting. To the extent that *Lindsey* v. *Dominguez, supra,* 217 Cal. 533, is inconsistent with our ruling here, that case is overruled.

We are compelled to this result by the impracticality of the *Lindsey* rule. In a county with a growing population, the board of supervisors will be continuously readjusting district boundaries.[6] When a county also has staggered elections, there is a danger that a potential candidate could be continuously precluded from running in a supervisorial election. Orange County is a rapidly growing county with staggered elections, and there is no guarantee that the present petitioner, under the *Lindsey* rule, would have been able to run for supervisor in the Fourth District in 1974 had he not changed his residence to remain in the First District. We believe that the rule which we announce today will eliminate any risk of this occurring.

In view of our above holding, we do not reach the constitutional issue presented by petitioner's third contention.

---

[6]Government Code section 25001, *supra,* is the principal provision for adjusting district boundaries. In addition, section 25001.3 provides, in pertinent part: "At any time between the decennial adjustments of district boundaries, the board may cause a census of the county to be taken . . . and may adjust the boundaries of the supervisorial districts on the basis of that census . . . ."

In the instant case, for approximately 18 years prior to November 15, 1971, petitioner had been a resident and elector of the First Supervisorial District. Had he remained such and had there been no change in the boundaries of the First District, he certainly would have qualified as a candidate for the office of supervisor of the First District. Due to a redistricting ordinance, however, he found that on November 26, 1971, its effective date, his place of residence would be removed from the First District. On November 15, 1971, prior to the effective date, he moved his residence and relocated it in an area remaining in the First District—an area not affected by the boundary change. Under our holding today, petitioner is clearly entitled to become a candidate for the office of supervisor of the First District.

Let a peremptory writ of mandate issue directing respondent registrar of voters to issue to petitioner, and, upon their proper completion, to accept from petitioner, nomination papers for the office of Supervisor of the First Supervisorial District of Orange County, and thereafter to take all necessary and proper steps to place petitioner's name on the ballot to be voted upon at the election to be held for such office on June 6, 1972. Petitioner shall recover his costs.

This judgment is final forthwith.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.